14-1916 (L)
Rai v. WB Imico Lexington Fee

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

————————

August Term, 2014

(Argued: May 4, 2015    Decided: September 21, 2015)

Docket Nos. 14-1916, 14-2120

————————

AVIRAL RAI, SANGEETA RAI,

*Plaintiffs-Counter-Defendants-*
*Appellees-Cross-Appellants,*

— v. —

WB IMICO LEXINGTON FEE, LLC, GARY BARNETT,

*Defendants-Counter-Claimants-*
*Appellants-Cross Appellees.*

————————

B e f o r e:

WALKER, LYNCH, AND LOHIER, *Circuit Judges*

————————

Defendants WB Imico Lexington Fee, LLC and Gary Barnett (collectively, "Imico") appeal from a judgment of the district court (Paul G. Gardephe, *Judge*) granting partial summary judgment to plaintiffs Aviral and Sangeeta Rai ("the Rais"), who had contracted to buy a Manhattan apartment from Imico. The district court held that, by furnishing a copy of the property report required by § 1703(a)(1)(B) of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 et seq. ("ILSA"), to the Rais' attorney, rather than directly to the Rais, prior to execution of the purchase agreement, Imico violated ILSA and the Rais were therefore entitled to rescind the purchase agreement pursuant to § 1703(c) of that statute. We disagree, and hold that furnishing the required property report to a represented purchaser's attorney is sufficient to meet a developer's obligations under that provision, and that the Rais therefore breached their contract.

On the Rais' cross-appeal, we agree with the district court's holding that, under our decision in Bacolitsas v. 86th & 3rd Owner, LLC, 702 F.3d 673 (2d Cir. 2012), Imico's failure to include a tax lot number in the purchase agreement did not violate § 1703(d)(1) of ILSA. We also hold that, pursuant to the liquidated damages provision in the parties' purchase agreement and § 1703(d)(3) of the same statute, Imico is entitled to the interest earned in escrow on the Rais' deposit, in addition to the deposit itself, as a remedy for the Rais' breach of the purchase agreement.

Accordingly, we AFFIRM the judgment of the district court insofar as it denied summary judgment to the Rais on their breach of contract claim based on Imico's failure to include a tax lot number in the purchase agreement, and REVERSE the judgment insofar as it granted summary judgment to the Rais based on Imico's failure to deliver the property report directly to them prior to executing the purchase agreement.

AFFIRMED IN PART; REVERSED IN PART.

LAWRENCE C. WEINER, Wilentz, Goldman & Spitzer, P.A., Woodbridge, NJ, *for Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants*.

RICHARD H. DOLAN (Thomas A. Kissane, *on the brief*), Schlam Stone & Dolan LLP, New York, NY, *for Defendants-Counter-Claimants-Appellants-Cross-Appellees*.

Meredith Fuchs, General Counsel, To-Quyen Truong, Deputy General Counsel, John R. Coleman, Assistant General Counsel, Nandan M. Joshi and Jessica Rank Divine, Litigation Counsel, Consumer Financial Protection Bureau, Washington, D.C., *for Amicus Curiae Consumer Financial Protection Bureau*.

GERARD E. LYNCH, *Circuit Judge*:

This appeal requires us to interpret several provisions of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 et seq. ("ILSA"). ILSA was enacted in 1968 to combat fraudulent practices in the sale of undeveloped subdivided land to vulnerable consumers misled about the value of the land that they were purchasing, often sight unseen. See Bodansky v. Fifth on Park Condo, LLC, 635 F.3d 75, 79 (2d Cir. 2011); Ronald J. Coffey & James d'A. Welch, Federal Regulation of Land Sales: Full Disclosure Comes Down to Earth, 21 Case W. Res. L. Rev. 5, 6-10 (1969) ("Coffey & Welch, Full Disclosure"). The Act sought to

protect purchasers by adopting extensive disclosure provisions resembling the provisions of the Securities Act of 1933. See Coffey & Welch, Full Disclosure 17-21; see also Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976).

Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants Aviral and Sangeeta Rai ("the Rais") argue that Defendants-Counter-Claimants-Appellants-Cross-Appellees WB Imico Lexington Fee, LLC, a real estate developer, and Gary Barnett, a principal of that company (collectively, "Imico"), failed to comply with two such disclosure provisions in connection with the Rais' attempt to purchase a condominium apartment: § 1703(a)(1)(B), which requires a developer to furnish a purchaser of any non-exempt lot of land with a property report prior to executing any contract to purchase that land, and § 1703(d)(1), which requires that any contract for the purchase of a non-exempt lot of land include "a description of the lot which makes such lot clearly identifiable." The Rais contend that, as a result of such violations by Imico, ILSA's § 1703(c) entitles them to rescind their contract with Imico to purchase the apartment.[1]

_____

[1] We held in Berlin v. Renaissance Rental Partners, LLC that ILSA applied to condominium units in multi-story buildings, like the one at issue here. 723 F.3d 119, 127, 129 (2d Cir. 2013). ILSA was amended in September 2014, however,

4

The Rais further contend that Imico violated § 1703(d)(1) of ILSA by failing to include the tax lot number of the apartment in the Purchase Agreement. The parties also disagree about the interpretation of § 1703(d)(3) of ILSA, which provides that, in the case of a purchaser's default, a seller is entitled to retain from the purchaser's deposit fifteen percent of the total purchase price of the lot (or the amount of damages incurred by the seller as a result of the default, if greater).

We conclude that: (1) Imico complied with § 1703(a)(1)(B) by providing the property report to the Rais' designated attorney; (2) Imico's description of the lot was sufficient to meet the requirements of § 1703(d)(1); and (3) Imico is entitled to any interest that accrued on the Rais' fifteen-percent down payment while the deposit was in escrow. Accordingly, we affirm the judgment of the district court insofar as it held that Imico did not violate § 1703(d)(1), but reverse the judgment

---

after the district court's decision in this case and after Imico had submitted its opening brief, to exempt condominium apartments from its disclosure requirements. See An Act to amend the Interstate Land Sales Full Disclosure Act to clarify how the Act applies to condominiums, Pub. L. No. 113-167, 128 Stat. 1882 (2014). We have not yet had occasion to decide whether that amendment has retroactive effect. Cf. Beaver v. Tarsadia Hotels, 29 F. Supp. 3d 1323 (S.D. Cal. 2014) (holding that the amendment does not apply retroactively), appeal filed, No. 14-80161 (9th Cir. Nov. 7, 2014). We need not consider that issue here, however, in light of our holding that Imico did not violate ILSA in any event.

5

insofar as it held that the Rais were entitled to rescind their contract due to Imico's alleged failure to comply with § 1703(a)(1)(B).

**BACKGROUND**

The facts relevant to this appeal are largely undisputed. In October 2007, the Rais decided to purchase an apartment in a condominium building, called "The Lucida," then being erected on East 85th Street in Manhattan. Imico was The Lucida's developer and sponsor.

The Rais identified their attorney on the transaction, John Lewin, to Imico. On October 29, 2007, a legal assistant working for Imico hand-delivered to Lewin a packet of documents including the property report required by § 1703(a)(1)(B) (the "Property Report" or "Report") and the condominium's Offering Plan. The packet was accompanied by a cover letter, which asked Lewin to review the enclosed documents with the Rais and to return a receipt, signed by the Rais, acknowledging their receipt of the documents. The receipt included a notice that Imico was required to provide purchasers with the Property Report before entering into any contract, and that the Rais' signatures would indicate their acknowledgment that they had received a copy of the Property Report. No signed copy of that receipt has been produced. Although the Rais do not dispute

6

that their attorney received the Property Report, they allege that they themselves never saw or received a copy.

On November 12, 2007, the Rais entered into a contract with Imico (the "Purchase Agreement") to purchase Apartment 8C in The Lucida for a price of $4,287,466. The Purchase Agreement required the Rais to make a down payment of fifteen percent of the total purchase price of the apartment, or $643,119.90. The Agreement included the following notice:

> IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGULATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT MAY BE CANCELED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.

Joint App'x 39.

On November 9, 2009, after construction on The Lucida was completed, the Rais' new attorney, Alan Wasserman, sent a letter to Imico informing it that the Rais had not received the Property Report and were exercising their right to rescind the Purchase Agreement. The letter also requested the return of the Rais' down payment plus all accrued interest.

Disputing the Rais' claim that they were entitled to rescind the Purchase Agreement, Imico proceeded to set a date scheduled for the closing on Apartment 8C. The Rais did not attend the closing. On July 16, 2010, Imico informed the Rais by letter that they were terminating the Purchase Agreement for default, and that the Rais' default entitled Imico to retain their deposit and any accrued interest.

**PROCEDURAL HISTORY**

On November 18, 2009, the Rais filed suit, alleging that Imico had violated ILSA's § 1703(a)(1)(B) by failing to furnish the Property Report to them in advance of the execution of the Purchase Agreement, and arguing that such failure entitled the Rais to "rescission and revocation of the Purchase Agreement, return of the deposits pursuant to 15 U.S.C. § 1703(e) and other damages." Joint App'x 22. The Rais also sought attorneys' fees, costs, and pre- and post-judgment interest.

The Rais subsequently amended their complaint to include two additional counts – also brought in separate actions by other purchasers of apartments in The Lucida – that Imico had violated §§ 1703(d)(1) and 1703(d)(3) of ILSA by, respectively, (1) failing to provide an adequate description of the unit in the

8

Purchase Agreement by omitting a tax lot number, and (2) including in the Purchase Agreement a liquidated damages clause that did not comply with § 1703(d)(3). Imico counterclaimed for breach of contract.

On March 19, 2012, in a decision addressing the Rais' claims along with those of the other Lucida plaintiffs, the district court granted summary judgment to all plaintiffs on the ground that Imico had violated ILSA § 1703(d)(1) by not providing tax lot numbers in the plaintiffs' purchase agreements. Accordingly, the court denied summary judgment to Imico on their breach of contract counterclaim and held that plaintiffs were entitled to rescind their purchase agreements and recover their deposits. Because the court granted summary judgment on that claim, it declined to reach the Rais' claims under § 1703(a)(1)(B), regarding the Property Report, and § 1703(d)(3), regarding the liquidated damages provision in the Purchase Agreement.

Subsequently, this Court issued a decision interpreting § 1703(d)(1) of ILSA. See Bacolitsas v. 86th & 3rd Owner, LLC, 702 F.3d 673 (2d Cir. 2012). In light of that decision, on February 8, 2013, Imico moved the district court to vacate its previous order, arguing that Bacolitsas foreclosed plaintiffs' claim that failure to include tax lot numbers in the purchase agreements rendered their

9

"description[s] of the lot[s]" deficient under § 1703(d)(1). The district court agreed and therefore vacated its award of summary judgment to all plaintiffs on their claims based on that provision. The court also held that <u>Bacolitsas</u> similarly foreclosed plaintiffs' argument that the Agreement's liquidated damages provision violated § 1703(d)(3). Having held that Imico had complied with §§ 1703(d)(1) and 1703(d)(3) of ILSA, the court granted summary judgment to Imico on its breach of contract counterclaims against nearly all the plaintiffs and held that Imico was entitled to retain those plaintiffs' deposits, less any interest earned in escrow.

As to the Rais, however, the district court again concluded that Imico had violated ILSA. Now having to reach the Rais' claim under § 1703(a)(1)(B), the district court held that Imico's failure to furnish the Property Report directly to the Rais prior to executing the Purchase Agreement violated that provision. The Rais, the court held, were therefore still entitled to rescission of the Purchase Agreement and the return of their deposit.

On May 12, 2014, the district court denied the Rais' motion for attorneys' fees and costs but granted them pre-judgment interest on their deposit at the

post-judgment statutory rate set forth in 28 U.S.C. § 1961(a), less any interest that deposit accrued while in escrow.

Imico appealed the judgment of the district court, and the Rais cross-appealed.

## DISCUSSION

We review de novo the district court's conclusions of law interpreting ILSA, including its grant of summary judgment to the Rais based on § 1703(a)(1)(B) of ILSA, its ruling that Imico's failure to provide a tax lot number in the Rais' Purchase Agreement did not violate ILSA § 1703(d)(1), and its interpretation of § 1703(d)(3) of ILSA to require Imico to return any interest earned on the Rais' deposit while in escrow.[2] See Bacolitsas, 702 F.3d at 678; Bodansky, 635 F.3d at 82.

**I.      § 1703(a)(1)(B): The Property Report**

The Rais' claim that Imico violated § 1703(a)(1)(B) rests on a strict interpretation of that provision's use of the word "purchaser."  The Rais maintain

---

[2] Because we reverse the district court's holding that Imico violated § 1703(a)(1)(B) of ILSA, we need not address whether the district court abused its discretion in awarding pre-judgment interest to the Rais.  Imico concedes that, should we reverse the district court's liability finding, that issue is moot.

that the statute requires delivery of the Property Report directly into the hands of the purchaser himself or herself, and that delivery to an attorney representing the purchaser in the transaction therefore does not suffice. They argue that their interpretation is supported by the statute's plain meaning, canons of statutory construction, the statute's overall remedial purpose, and the administrative regulations promulgated under ILSA. We address those arguments in turn.

**A.      Plain Meaning and Canons of Interpretation**

Among the "[r]equirements respecting [the] sale or lease of lots" that ILSA enumerates in the following:

> It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails . . . to sell or lease any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee . . . .

15 U.S.C. § 1703(a)(1)(B).

The Rais emphasize that ILSA requires the report to be furnished to the *purchaser*, and that the statute defines a "purchaser" as "an actual or prospective purchaser or lessee of any lot in a subdivision," see id. § 1701(10) – a definition

12

that makes no reference to any agent. ILSA nowhere uses the term "agent" in connection with a purchaser; that term, however, is used throughout the statute in connection with developers. Indeed, the statute defines an "agent" as "any person who represents, or acts for or on behalf of, a *developer* in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision." Id. § 1701(6) (emphasis added). Moreover, the Rais note, attorneys are expressly excluded from ILSA's definition of "agent" when their "representation of another person consists solely of rendering legal services." See id.

The Rais argue that "purchaser" in § 1703(a)(1)(B) must be interpreted to exclude any agent or attorney acting on a purchaser's behalf. First, they argue that their construction is required by the statute's plain meaning. Indeed, "when [a] statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004); see also Lee v. Bankers Trust Co., 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms.") (internal citation omitted). Second, the Rais invoke the interpretive canon of *expressio unius est exclusio alterius* to argue that

13

the statute's express inclusion of the term "agent" with respect to developers, and its precise definition of "agent," confirms its drafters' intention to exclude from any definition of "agent" any attorney or other agent of a purchaser.

The district court agreed with the Rais that those arguments "indicate[] that Congress was cognizant of agency principles when drafting ILSA; chose to define the term 'agent' in a highly restrictive fashion that relates only to developers and not to purchasers; and – in excluding attorneys – adopted a definition that is not consistent with common law principles." Rai v. WB Imico Lexington Fee, LLC, No. 09 Civ. 9586, 2013 WL 5420940, at *9 (S.D.N.Y. Sept. 27, 2013). According to the district court, "[i]t would be anomalous to conclude that Congress intended 'purchaser' to include agents when Congress chose to define 'agent' as a 'person who represents, or acts for or on behalf of, a *developer*." Id. (emphasis in original).

In our view, however, neither the word "purchaser" specifically nor § 1703(a)(1)(B) more generally warrants such a restrictive interpretation. At the outset, we are unpersuaded by the Rais' plain meaning argument. The terms of the statute do not plainly compel their interpretation. The language to be interpreted is not the word "purchaser" in isolation – we have no doubt that it

14

refers to the party actually purchasing the property – but rather the full phrase of which it forms a part. ILSA requires that a copy of the Property Report be "furnished to the purchaser." The Rais argue that they, the "purchaser[s]," were not "furnished" with a copy of the Report, because one was not delivered to them. But the language of the statute is at least equally consistent with Imico's claim that it "furnished" the Rais with a copy of the report by delivering one to the attorney who was acting on their behalf in connection with the transaction. Since the meaning of the language of the provision is not plain, we must look beyond "plain meaning" to interpret it.

Ambiguous language in statutes should be interpreted in light of background legal concepts and ordinary commercial practice. See Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 35 (2d Cir. 2012) ("As a general matter, we interpret a statute to abrogate a common law principle only if the statute speaks directly to the question addressed by the common law.") (internal quotation marks omitted). As the district court, notwithstanding its ultimate conclusion, recognized, Rai, 2013 WL 5420940, at *9, the Rais' interpretation defies traditional common law principles of agency and conflicts with the usual course of dealing in transactions in which parties are represented by attorneys. These established

15

common law principles of agency support the interpretation urged by Imico: that delivery of a Property Report to a purchaser's designated attorney constitutes "furnish[ing]" a copy of the Report to the purchaser and complies with ILSA.[3]

We begin with a proposition fundamental to the law of agency. "For most purposes, a person can properly create a power in an agent to achieve the same legal consequences by the performance of an act as if he himself had personally acted." American Law Institute, Restatement (Second) of Agency § 17, cmt. a (1958). More specifically, "[a] person has notice of a fact if his agent has knowledge of the fact, reason to know it or should know it, or has been given a notification of it." Id. § 9(3). See also Restatement (Third) of Agency § 5.02 ("A notification given to an agent is effective as notice to the principal if the agent has

---

[3] The Consumer Financial Protection Bureau ("CFPB"), which is now responsible for administering ILSA, see the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, sections 1061(b)(7) and 1098A, 124 Stat. 1376, 2038, 2105 (2010), codified at 12 U.S.C. § 5581(b)(7) and 15 U.S.C. §§ 1715, 1718 (2012), and whose views on the question the Court solicited, concurs in this conclusion, advising that in its view ILSA "permit[s] a developer to comply with § 1703 by delivering the property report to the purchaser's designated agent." CFPB Amicus Br. 12-13. We afford the CFPB's interpretation Skidmore deference "on account of the specialized experience and information available to the agency," and because the "reasonable determination . . . advanced in [its] amicus brief . . . is not a post hoc rationalization." See Conn. Office of Prot. and Advocacy For Pers. With Disabilities v. Hartford Bd. of Educ., 464 F.3d 229, 239 (2d Cir. 2006) (citing Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944)).

actual or apparent authority to receive the notification . . . ."); id. § 5.03 ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal . . . .").

Where, as here, a third party has no reason to believe that an agent will shirk his duties to the principal, that party's provision of a document to a clearly designated agent, particularly with instructions to review the document with the principal, satisfies any duty of notification under ordinary circumstances. See id. § 5.02; see also Corporacion de Mercadeo Agricola v. Mellon Bank Int'l, 608 F.2d 43, 46 (2d Cir. 1979) (where revocation notice was sent to corporation, knowledge of revocation was imputed to corporation, even where sent to the wrong bureau, because "[n]otice to the agent . . . is notice to the principal, unless the person giving notice has reason to know that the agent has no duty to or will not transmit the message to the principal.").

It is well established, moreover, that an attorney retained either for litigation or to represent a party in the course of a transaction is that party's agent. "The relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal." Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994). In connection with a transaction, "it is an agent's duty to

17

communicate to his principal the knowledge he has concerning the subject of negotiation and there is a presumption that he will perform that duty. . . . The rational explanation . . . is that common justice requires that one who puts forward an agent to do his business should not escape the consequences of notice to, or knowledge of, his agent." Munroe v. Harriman, 85 F.2d 493, 495 (2d Cir. 1936). The proper course of dealing in both litigation and transactions in which parties are represented by counsel is to direct all legal documents through counsel. See, e.g., Fed. R. Civ. P. 5(b)(1) ("If a party is represented by an attorney, service . . . must be made on the attorney unless the court orders service on the party.").

In contrast, the Rais have not pointed us to a single instance where delivery of a document required by statute or rule to a represented party's attorney has been held insufficient to meet a disclosure obligation. Absent a clear expression to the contrary in ILSA, then, Imico's provision of the Property Report to the Rais' attorney was sufficient to meet ILSA's mandate that the Property Report be "furnished" or "given" to the purchaser. See 15 U.S.C. § 1703(a)(1)(B), 1703(c).

There is no such contrary indication in ILSA. First, the statute nowhere

18

states that the Property Report must be given directly to a purchaser, rather than to the purchaser's attorney. The use of the passive verbs "furnished" and "given" indicates that the purchaser must be provided with a copy of the Report. Neither provision states, however, that the developer must hand the Report directly to the purchaser, and not to the purchaser's attorney, who likely handles all other documents relevant to the transaction. Indeed, even where an attorney is not involved in the transaction, it would be peculiar to interpret the statute as forbidding the developer to satisfy its obligation to furnish the Report to a purchaser by providing a copy to the purchaser's agent. Has a developer not "furnished" the purchaser with a copy of the Report if he hands it to a messenger dispatched by the purchaser to receive it? Or if he leaves it with the purchaser's secretary or receptionist?[4]

Nor are we persuaded by the Rais' argument that the ordinary rules of agency do not apply under ILSA because the statute expressly defines "agents" as persons acting on behalf of developers, and excludes attorneys from the definition of "agent." 15 U.S.C. § 1701(6). The statute defines "agent" as that

---

[4] Indeed, as the CFPB notes, if the purchaser is a corporation, it can only be furnished a document by supplying the document to one of its human agents. CFPB Amicus Br. 12.

term is used in ILSA itself; it does not purport to overturn ordinary legal principles or trump normal business practices in interpreting provisions of ILSA that do not use that term. ILSA uses the term "agent" only in reference to developers, and only in making clear that the obligations on developers also apply to their agents (but not to attorneys acting on their behalf).[5] See, e.g., 15 U.S.C. § 1703(a) (making it "unlawful for any developer or agent" to engage in certain activities); § 1706(e) (authorizing the Bureau to access the books and papers of "the developer, any agents, or any other person"); § 1709(a) (authorizing private actions against "a developer or agent"). That Congress was silent as to the role of attorneys representing purchasers in such transactions is

---

[5] We agree with Imico's suggestion that the exclusion of attorneys in this context is intended "to avoid intruding on the attorney-client relationship, or to impose on an attorney a disclosure obligation that could possibly conflict with the attorney-client privilege." Appellants' Br. 23. There is no reason to believe that, in connection with the notice obligation in § 1703(a)(1)(B), which does not refer to "agents" at all, the exclusion of attorneys from the definition of "agent" is somehow meant to provide that handing the Property Report to an employee of a purchaser such as a receptionist or messenger counts as furnishing the Report to the purchaser, while giving one to the purchaser's attorney does not. The CFPB also agrees, noting that "the exclusion of attorneys from ILSA's definition of 'agent' has no relevance. The exclusion simply means that attorneys will not be held liable as 'agents' under ILSA; it does not suggest that attorneys cannot act as a purchaser's agent with respect to the receipt of property reports from a developer." CFPB Amicus Br. 17 n.8 (internal citation omitted).

unsurprising, since Congress did not seek to impose any new obligations on purchasers or on those acting on their behalf. Such silence does not evince a specific intent to overturn ordinary principles of the law of agency, or to require delivery of required documents personally to purchasers rather than to their agents, including attorneys. As the Supreme Court has recently reminded us, in interpreting acts of Congress, a court's "duty . . . is to construe statutes, not isolated provisions." King v. Burwell, 135 S. Ct. 2480, 2489 (2015) (internal quotation marks omitted). The statute's overall scheme aims to combat unscrupulous practices on the part of developers, not to upend the usual mechanics of real estate transactions for both developers and purchasers.

The Rais' argument that the *expressio unius* canon of statutory construction further demonstrates that the statute excludes altogether attorneys acting on behalf of purchasers is similarly unpersuasive. That canon "has force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003) (internal quotation marks omitted). Rather than setting forth a "series of two or more terms or things that should be understood to go hand in hand, thus raising the

21

inference that a similar unlisted term was deliberately excluded," Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 370 (2d Cir. 2006) (internal quotation marks omitted), ILSA simply defines "agent," as that term is specifically used in various provisions of the statute in connection with developers, and fails to reference agency in connection to purchasers in other provisions. Such an approach does not present an "associated group or series" that calls to mind a conspicuously absent item. On both a conceptual and a linguistic level, then, there is no indication that ILSA's drafters "considered the unnamed possibility and meant to say no to it." Barnhart, 537 U.S. at 168. Under these circumstances, the statute's silence does not warrant an *expressio uniu*s inference.[6]

Neither the text of ILSA nor any applicable canon of interpretation suggests an intent on the part of Congress to deviate from ordinary common law agency principles in connection with the provision of notices, or to disrupt the ordinary industry practice in real estate transactions of providing documents to a party's attorney where that party has designated one. Nor have the Rais pointed

---

[6] Moreover, even if the canon were applicable, we are not to treat "as conclusive the inference that Congress intended to exclude that which it did not explicitly include," but rather to view the canon "as but an aid to construction." Frank G., 459 F.3d at 370.

to any legislative history suggesting such an intent.

**B.      ILSA's Purpose**

The Rais also cite ILSA's overall remedial purpose in support of their interpretation of § 1701(a)(1)(B).  They argue that requiring delivery of a property report to purchasers directly, rather than to their attorneys, furthers ILSA's comprehensive disclosure goals by making it more likely that buyers will actually receive the required information, and will receive it sufficiently in advance of their execution of a contract.

But permitting delivery of a property report through an attorney – where a party has opted to be represented by an attorney for purposes of the transaction – is equally consistent with ILSA's consumer protection purpose.  Here, the Rais notified Imico that they had retained an attorney, and under such circumstances, consumer protection interests are unlikely to be furthered by requiring the developer to disregard the purchasers' preference for representation by counsel and to deliver the Property Report, unlike the other offering documents, directly to the purchaser.  As Imico notes, it is precisely for consumer protection purposes that parties choose to retain counsel to provide them with advice and assistance, especially in the case of large transactions such as the Rais' purchase here in

23

excess of four million dollars. It is of no moment that "at the inception of the transaction and before a purchase agreement is signed – the point at which the Act mandates that the Property Report be supplied – purchasers often are not even represented by counsel." Appellees' Br. 26. Imico merely argues that, in the instances in which they *are* so represented, ILSA's consumer protection goal is furthered by heeding, not ignoring, purchasers' desire to conduct the transaction through counsel. We agree.[7] Where parties to large commercial transactions are represented by lawyers, the vast majority of documents will be reviewed by counsel in the first instance, and we see no reason why the Property Report should not be entrusted to counsel in accordance with a purchaser's wishes. As with other documents, where the developer has provided a copy to the party's designated attorney, the developer has fulfilled his obligations under § 1703(a)(1)(B).

Practical considerations also militate in favor of Imico's interpretation of

---

[7] So does the CFPB, the agency tasked not only specifically with administering ILSA, but more generally with protecting the interests of consumers in financial transactions: "[A]llowing purchasers the flexibility to appoint agents to manage their ILSA-covered transactions is consistent with ILSA's statutory purpose. . . . None of [its] purposes are undermined if, instead of reviewing the property report directly, the consumer elects to hire counsel to receive and review the relevant materials." CFPB Amicus Br. 20-21.

the statute. For example, delivery directly to a purchaser may prove difficult in some instances, and a developer or the developer's agent might, for example, leave a copy with a purchaser's assistant, a messenger, or a receptionist. We find it difficult to believe that Congress intended to forbid any such method of delivery, yet the Rais' interpretation would demand delivery directly into the hands of a purchaser, excluding any agent at all – whether messenger, attorney, or assistant – on pain of rescission of the entire contract. Additionally, the common practice of forming a corporation, limited liability company, or family trust for the purpose of purchasing real estate would present perplexing questions were we to adopt the Rais' interpretation. Where the purchaser has done so, it makes even more sense to assume that relevant documents will, and should, be routed through the relevant entity's attorney. As noted above, in the case of a corporation, the only way to furnish notice of a fact is through an agent. Nothing in ILSA suggests that Congress intended to foreclose or complicate that manner of conducting real estate transactions.

C. **Administrative Regulations**

25

Finally, the Rais point to the administrative regulations promulgated under ILSA by the U.S. Department of Housing and Urban Development ("HUD"), and subsequently reissued by the CFPB,[8] which require that several cautionary statements be incorporated, jot-for-jot, in the Property Report. For example, the cover page must contain the exhortation: "READ THIS PROPERTY REPORT BEFORE SIGNING ANYTHING," 12 C.F.R. § 1010.105(b), and the next page must remind the purchaser to "read all warnings carefully before signing any contract or agreement," id. § 1010.107. Finally, the receipt must state: "We must give you a copy of this Property Report and give you an opportunity to read it before you sign any contract or agreement. By signing this receipt, you acknowledge that you have received a copy of our Property Report." Id. § 1010.118, Appendix; see also Joint App'x 318 (unsigned receipt form provided to the Rais' attorney). According to the Rais, the cautionary statements and use of the second-person pronoun in this required document further demonstrate that the report must be given to the actual purchaser, rather than to the purchaser's agent.

But these requirements tell us nothing more than is inherent in the

[8] As noted above, the CFPB is now entrusted with the rulemaking authority under ILSA that was formerly granted to HUD. See 12 U.S.C. § 5581(b)(7).

statutory provision itself: that the Property Report is intended to be "furnish[ed] to the purchaser." 15 U.S.C. § 1703(a)(1)(b). Its content is addressed to the purchaser, and the developer is required to make it available to the purchaser. Neither the overall wording of the Report and receipt nor the use of the second person, however, suggests that the delivery of the Property Report to the purchaser through an agent such as the purchaser's attorney violates the statute. The CFPB confirms this conclusion, advising that its regulations "do not purport to address the method by which a property report must be delivered to purchasers who have hired an attorney to represent them." CFPB Amicus Br. 13.[9]

In sum, we conclude, based on the provision's text as informed by principles of statutory construction, the purpose of the statute, and the administrative regulations promulgated under the statute, that delivery of a Property Report to a party's designated attorney complies with § 1703(a)(1)(B) of ILSA. Imico therefore acted in accordance with that provision, and the Rais are not entitled to rescind the Purchase Agreement on the basis of that provision.

---

[9] The Rais have not contended that the Imico's apparent failure to secure and retain a signed copy of the receipt violates ILSA or warrants the extreme remedy of rescission. We therefore do not consider whether such an argument would have merit.

**II. § 1703(d)(1): Tax Lot Numbers**

In their cross-appeal, the Rais argue that the district court erred in vacating, in light of this Court's decision in <u>Bacolitsas</u>, its previous decision that Imico's failure to include tax lot numbers for the individual units in the Lucida plaintiffs' purchase agreements violated a different provision of ILSA, § 1703(d)(1). We reject the Rais' argument that the failure to provide a tax lot number renders Imico's "description of the[ir] lot" under § 1703(d)(1) deficient, and agree with the district court that <u>Bacolitsas</u> forecloses such a claim.

ILSA provides that a purchaser may revoke, within two years of the date of signing, "[a]ny contract or agreement which is for the sale or lease of a lot . . . which does not provide . . . a description of the lot which makes such lot clearly identifiable and which is in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction in which the lot is located." 15 U.S.C. § 1703(d)(1). According to the Rais, that provision required that the tax lot number of the unit they were purchasing be included in the Purchase Agreement, both because that information would be required in a deed conveying the unit in order for it to be acceptable to the Office of the City Register in Manhattan – the "appropriate

28

public official for maintaining land records in the jurisdiction" in which The Lucida is located **[Pl. Br. 32-33]** – and because the tax lot number is a useful and commonly employed method of identifying property **[Pl. Br. 34]**. The Rais' unit, however, was identified only as "the unit ('Unit') to be designated as Unit 8C in the [Condominium Offering] Plan." Joint App'x 26.[10]

In Bacolitsas, plaintiffs sought to revoke a purchase agreement for defendants' failure to comply with § 1703(d)(1). In that case, as here, plaintiffs had entered into an agreement to purchase a unit in a condominium building still under construction. 702 F.3d at 677. They sought to revoke the agreement, inter alia, on the grounds that the purchase agreement's description of the property was inadequate to satisfy § 1703(d)(1). Id. at 679. The district court held for plaintiffs, on the basis that the statute requires that the purchase agreement *itself* be recordable – which it was not, because it had not been "acknowledged or

---

[10] At oral argument, the Rais contended that Imico's apparent failure to secure and retain a signed copy of the receipt violated ILSA and warranted the extreme remedy of recission. Oral Arg. Tr. at 17:1-3. They acknowledged, however, that there may be other methods of proving the purchaser received the Report. Id. At 11:25-12:6. One such method is proving that the Property Report was given to the purchaser's agent. To the extent that the Rais argue that a developer necessarily violates ILSA if it cannot produce such a receipt, we reject that argument.

proved." Id.

We reversed, however, in an opinion that elaborated on the requirements set forth in § 1703(d)(1). First, we held that the contract or agreement itself need not be in a form acceptable for recording, so long as the document includes a description of the lot that "(1) makes such lot clearly identifiable *and* (2) is in a form acceptable for recording." Id. at 679-80 (emphasis in original) (internal quotation marks omitted). "[I]nterpreting the statute to require that the contract or agreement satisfy the technical requirements for recordability in the applicable local jurisdiction" did not, we held, further ILSA's purpose. Id. at 680.

Bacolitsas went on to address whether the description of the unit contained in the agreement in that case satisfied ILSA. See id. at 680-85. Plaintiffs there contended that, because a condominium unit deed in New York must include "the liber, page and date of recording of the [condominium] declaration," N.Y. Real Prop. L. § 339-o, the description of the lot in a purchase agreement, if it is to be in a "form acceptable for recording," must likewise contain those items. 702 F.3d at 681. We disagreed, however, explaining that "nothing in § 1703(d)(1) suggests that Congress intended the description of the lot mandated under ILSA be coextensive with what is required for conveyance of an individual unit in the

relevant jurisdiction." Id. A contrary ruling, moreover, would have prohibited the "common and long-standing" practice of executing purchase agreements before a development has been completed, because only once construction is finished can a declaration be recorded, and can the "liber, page and date of [its] recording" be provided. Id. at 682, citing N.Y. Real Prop. L. § 339-o. Other provisions of ILSA demonstrate that Congress was aware of that practice and did not intend to foreclose it; Congress necessarily contemplated, therefore, "that the description of a unit required under § 1703(d)(1) m[ight] not be adequate for conveyance." Id. Bacolitsas accordingly held that "[b]y its plain language, the description of the lot [required by § 1703(d)(1)] need not be equivalent to the type of description required to convey the unit." Id. at 683. Defendants' failure to include the "liber, page and date of recording" did not, therefore, render the description of the lot in Bacolitsas deficient under § 1703(d)(1).

The Rais argue that the Bacolitsas holding is inapposite, because they contend neither that the Purchase Agreement itself must be recordable under § 1703(d)(1), as the district court held in Bacolitsas, nor that the description of their unit was inadequate for lacking the "liber, page and date of recording." Instead, as discussed above, they argue that it is the absence of a tax lot number

31

that renders the description of the unit here deficient, because under New York law, a recording officer is prohibited from recording "any conveyance of real property . . . unless accompanied by a transfer report form . . . [containing] . . . the appropriate tax map designation, if any." N.Y. Real Prop. L. § 333(1-e)(i), (ii)(3). In further support of their argument, the Rais emphasize that, unlike the developer in Bacolitsas, Imico had already sold enough units for tax lot numbers to be designated, and therefore could conceivably have supplied tax lot numbers for the individual units in their purchase agreements. Finally, they employ Imico's own words regarding the necessity of tax lot numbers for proper identification and recordation of a unit to suggest that Imico has conceded that the Purchase Agreement did not comply with § 1703(d)(1).

To be sure, the absence of tax lot numbers was not the specific subject of the Bacolitsas plaintiffs' argument. But we agree with the district court that our "reasoning [in Bacolitsas] as to 'liber, page and date of recording of the declaration' applies with equal force to unit-specific tax lot numbers." Rai, 2013 WL 5420940, at *5. Bacolitsas held that the test for sufficiency of a lot description under § 1703(d)(1) was not coextensive with what is required for conveyance, because in drafting ILSA, "Congress was concerned with disclosure, *not*

32

conveyance." Bacolitsas, 702 F.3d at 681 (emphasis in original). And our reasoning in Bacolitsas explicitly contemplated that a description could be sufficient under § 1703(d)(1) even without a tax lot number, observing that "it is common in New York for sponsors to offer units for sale and to enter into purchase agreements for those units prior to the filing of the condominium declaration. . . . [B]ecause a condominium declaration ordinarily cannot be filed until new tax lot numbers are assigned to each unit, which can only occur once construction is complete, buyers often will execute purchase agreements before the declaration is recorded, i.e., prior to completion of the development." Id. at 682 (internal citation omitted). In other words, acknowledging that no tax lot number had been provided to the Bacolitsas plaintiffs, we held that the purchase agreement nevertheless complied with § 1703(d)(1).

The Rais attempt to distinguish this case from Bacolitsas by highlighting that, at the time they entered into the Purchase Agreement, purchase agreements had been signed for at least fifteen percent of the units being offered for sale, which meant that the Condominium Offering Plan could be declared effective and that tax lot numbers could therefore have been obtained, pursuant to 13 N.Y.C.R.R. § 20.3(q). But they point us to no provision or case law that obligates

33

a developer to obtain tax lot numbers as soon as that fifteen percent mark is reached, or that ILSA allows rescission of a purchase agreement where the developer could have acquired and disclosed a tax lot number but failed to do so (while not allowing such rescission when the purchase agreement is for one within the first fifteen percent of units sold). By pointing to the frequent practice of purchasers executing contracts prior to the point at which a developer can obtain those numbers in support of the conclusion that § 1703(d)(1)'s intent was not to mandate the inclusion of all information – including tax lot numbers – required for conveyance in a purchase agreement, see Bacolitsas, 702 F.3d at 682, Bacolitsas did not limit its holding only to circumstances in which tax lot numbers could not conceivably be provided in a purchase agreement. The absence of a tax lot number did not render the Purchase Agreement deficient under § 1703(d)(1), regardless of the stage of The Lucida's completion at the time the Purchase Agreement was executed. The Rais do not contend that any of the information that we held to be sufficient to satisfy § 1703(d)(1) in Bacolitsas, see id. at 684 n.6, was withheld from them in this case. See Rai, 2013 WL 5420940, at *6.

Finally, the Rais attempt to bolster their argument with Imico's own words,

34

in the Declaration of Condominium, to the effect that a tax lot number is "necessary for the proper identification" of a unit. Joint App'x 224. That statement directs the purchaser to "Exhibit B" of the Declaration for that "necessary" information. Id. But Exhibit B, the Rais protest, provides a chart with space to list each unit and its corresponding tax lot number, along with other information, that remains blank and contains the header "TO BE COMPLETED PRIOR TO RECORDATION OF CONDOMINIUM DECLARATION." Rai v. WB Imico, No. 09 Civ. 9586 (PGG), ECF No. 18, Ex. 12 at 972. The Rais characterize these statements as concessions by Imico that a unit's tax lot number must be included in its purchase agreement in order for that agreement to meet § 1703(d)(1)'s requirement that the description be in a "form acceptable for recording."

But neither statement constitutes such a concession. That Imico described a number of attributes as "necessary for the identification" of each unit does not mean that each attribute is required to provide a legally adequate description of the unit for purposes of ILSA. That information was to be filled in "prior to recordation" of the Condominium Declaration; its absence, however, does not demonstrate that the description of the unit given to the Rais in their Purchase

35

Agreement was inadequate – it merely restates the fact that that description did not include all of the information required to legally convey the unit. Per the foregoing discussion, that does not mean the description violated § 1703(d)(1).

Accordingly, we affirm the district court's conclusion that Imico complied with ILSA § 1703(d)(1).

**III.    § 1703(d)(3): Interest**

Because Imico did not violate either ILSA § 1701(a)(1)(B) or § 1703(d)(1), it follows that the Rais were not entitled to rescind the Purchase Agreement, and that they therefore breached their contract with Imico by failing to close on the transaction. That breach necessarily raises the question of the remedy to which Imico is entitled.

In this case, that remedy is set out in both the Purchase Agreement and in ILSA. The Purchase Agreement contains a liquidated damages provision that states:

> [I]f and only to the extent that the sale of the unit is not
> exempt from the provisions of [ILSA], the amount of the
> Deposit to be retained by [Imico] upon Purchaser's
> failure to cure a default . . . will be the greater of (i)
> fifteen percent (15%) of the Purchase Price (excluding
> any interest owed) or (ii) the amount of damages
> incurred by [Imico] due to the default.

Joint App'x 32. That provision complies with ILSA's requirement that a contract provide

> that, if the purchaser . . . loses rights . . . in the lot as a result of a default or breach of the contract or agreement which occurs after the purchaser . . . has paid 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, the seller . . . shall refund to such purchaser . . . any amount which remains after subtracting (A) 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, or the amount of damages incurred by the seller . . . as a result of such breach, whichever is greater, from (B) the amount paid by the purchaser . . . , excluding any interest paid under the contract or agreement.

15 U.S.C. § 1703(d)(3).

Imico argues that both the text of these provisions and standard practice in the real estate industry compel a finding that they are entitled to retain any interest earned on the Rais' fifteen percent deposit while it was in escrow, along with the deposit itself. The Rais contend that, should they be found to have breached the contract, Imico is entitled only to the statutorily mandated fifteen percent deposit, and no more, requiring that Imico refund to them any interest earned on that deposit. They argue first, however, that the issue of who is entitled to any interest earned on the deposit is not even properly before us,

because the district court, having ruled in favor of the Rais on the liability issues, did not reach the issue of any damages due on Imico's counterclaim.

The Rais' argument would have us ignore the fact that the issue of entitlement to interest on the deposit was raised and briefed before the district court, and indeed decided by that court. The district court addressed that issue with respect to the other Lucida apartment purchasers, whom it held to be in breach of their contracts when it found that Imico had not violated § 1703(d)(1), and who are therefore situated identically to the Rais in light of our decision today. The district court held that, because those other plaintiffs' deposits all amounted to exactly fifteen percent of the purchase price, and Imico had not pled any damages, any interest earned on those deposits was to be returned to plaintiffs. Rai, 2013 WL 5420940, at *11 n.23.

Although we generally do not consider arguments not addressed by the district court, as we noted in Bacolitsas, that "is a prudential rule we apply at our discretion," and "[i]n determining whether to consider such issues, we rely on a number of factors, including the interests of judicial economy, and whether the unaddressed issues present pure questions of law." Bacolitsas, 702 F.3d at 681 (internal citations omitted); see also Booking v. Gen. Star Mgmt. Co., 254 F.3d

38

414, 418-19 (2d Cir. 2001) (noting that we have "broad discretion to consider issues not raised in the District Court," and that it therefore "follows . . . that we have discretion to consider issues that were raised, briefed, and argued in the District Court, but that were not reached there."). Those factors militate in favor of reaching the issue of the accrued interest here. The question of entitlement to that interest, which is governed by statutory and contractual provisions, presents a purely legal issue. Confronting the question now would also further the interest of judicial economy. Were we to remand this case to the district court to determine which party should retain the interest, there is no reason to think that the district court would arrive at a different conclusion than it reached as to all of the other plaintiffs whom it found to be in breach of their contracts with Imico. Doing so would therefore only result in delay and in additional, and unnecessary, expenditure of time and resources by the parties, by the district court, and eventually by this Court on a subsequent appeal. In light of the Rais' failure to point to any material difference between their own position and that of the other Lucida plaintiffs – despite their having been on notice, from at least the filing of Imico's opening brief, that Imico was asking the Court to address the issue of interest on their down payment – we see no reason not to decide that

39

question. See Bacolitsas, 702 F.3d at 681; Petrosino v. Bell Atl., 385 F.3d 210, 224 (2d Cir. 2004).

We conclude that the relevant provisions of ILSA and the Purchase Agreement do not undermine the standard rule that a party entitled to a payment is also entitled to interest earned on that payment during the time the party was deprived thereof. Section 1703(d)(3) "exclud[es] any interest" at each stage of the calculation of damages it prescribes. In calculating fifteen percent of the purchase price of the lot, "any interest owed" is to be excluded; in calculating the total amount paid by the purchaser, "any interest paid" is to be excluded. The former is to be retained by the seller, and any amount which remains after subtracting the former from the latter – that is, if the purchaser previously put down a deposit greater than fifteen percent – is to be returned to the purchaser. Consistent with ILSA, the parties' Purchase Agreement instructs that Imico is to retain fifteen percent of the purchase price, also "excluding any interest owed" (unless the damages they have incurred exceeds that amount). While these provisions are hardly models of clarity, they indicate that interest is not to factor into the liquidated damages calculation.

That a developer must refund an amount that is calculated by excluding any interest owed or paid under the contract, and may retain an amount that likewise excludes any consideration of interest owed or paid under the contract, does not speak either way, in our view, to which party is entitled to the interest earned on a deposit held in escrow. And in the absence of any statutory mandate as to that interest, we find no reason to deviate from the common law rule, well established in New York and elsewhere, that "interest follows principal" and therefore is the "property of the owner of the principal." Phillips v. Wash. Legal Found., 524 U.S. 156, 165, 172 (1998) (internal quotation marks omitted) (collecting cases); see also Stuarco, Inc. v. Slafbro Realty Corp., 289 N.Y.S.2d 883, 885 (2d Dep't 1968) (tenant was entitled to the interest accrued on a security deposit, even in the absence of a provision in the lease regarding interest, because, under New York's General Obligations Law, deposit and interest accrued thereon continued to belong to tenant and was merely being "held in trust" by landlord); Havender v. Brodbeck, 144 N.Y.S. 418, 419 (1st Dep't 1913) ("Ordinarily interest follows the principal, as the shadow does the substance.") (internal quotation marks omitted); cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 162 (1980) ("The usual and general rule is that any

41

interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal.").

That rule is premised on basic principles of fairness, which are fully applicable to this case. If A and B dispute whether A owes a sum of money to B, the parties agree to put the disputed sum into an interest-bearing escrow account pending resolution of the dispute, and it is ultimately determined that the money should indeed be paid to B, B is entitled to the interest, because if the money had been paid when due, B would have had the use of the money; if it is determined that there was no debt, the money has always belonged to A, who would also receive the interest. The same is true here. If the Rais were entitled to rescind the contract, the deposit would be returned to them, along with the interest it earned in the meantime. But they are not, so the deposit belongs to Imico, along with the interest it has earned. Nothing in the quoted provisions of ILSA, which concern only the calculation of the *principal* amount of the deposit that the developer may demand and, in the event of breach by the purchaser, retain, has any bearing on this basic legal principle.[11]

---

[11] In addition to the lack of guidance from ILSA and the backdrop of common law, another provision in the Purchase Agreement further suggests that the parties expected that the interest earned on the Rais' deposit would go to Imico if

We therefore hold that, because Imico is rightfully entitled to retain the Rais' fifteen percent down payment, it is likewise entitled to the interest earned on that money.

**CONCLUSION**

We fully recognize that ILSA is a "strict-liability" statute that relies, to some extent, on technicalities in ensuring its foremost goal of consumer protection. See Bodansky, 635 F.3d at 86. But it does not require us to read into the statute requirements that it does not contain, thereby expanding liability for developers at the behest of parties wishing to back out of contracts into which they entered knowingly and armed with full disclosure.

For the foregoing reasons, we AFFIRM the judgment of the district court that Imico complied with ILSA § 1703(d)(1), notwithstanding that the description of the property did not contain the tax lot number, and REVERSE the judgment of the district court that Imico violated ILSA § 1703(a)(1)(B) by delivering the

they defaulted. That provision states that, if the purchaser defaults, Imico "may retain all sums deposited by Purchaser . . . , together with interest earned thereon . . . ." Joint App'x 32, § 15.2. While such a contractual provision cannot trump any limits imposed by ILSA (as the contract itself acknowledges, see id.), the provision serves as further evidence that the ordinary practice, in the absence of any statutory indication to the contrary, is to award accrued interest to the party entitled to the principal.

43

Property Report to the Rais' attorney and not to the Rais directly. We also hold that, pursuant to ILSA § 1703(d)(3) and the parties' Purchase Agreement, Imico is entitled to retain the Rais' fifteen percent down payment, as well as any interest accrued thereon, as a result of the Rais' breach of the Purchase Agreement in failing to close on their unit. The case is REMANDED to the district court for further proceedings consistent with this opinion.